12/96)

# CIVIL COVER SHEET

ATTACHMENT #2

S-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required v, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**PLAINTIFFS**

Richard W. Comerford

**DEFENDANTS**

Mitchell W. Steward J.
Francusis

RECEIVED MAR 1 2005 D. C.
Washington

COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Plymouth
(EXCEPT IN U.S. PLAINTIFF CASES)

2005 FEB 28 IN CLERK'S OFFICE
U.S. DISTRICT COURT
DISTRICT OF MASS.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se

ATTORNEYS (IF KNOWN)

**05-10439 WGY**

**ASIS OF JURISDICTION**  (PLACE AN "X" IN ONE BOX ONLY)

- ☐ J.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**ORIGIN**  (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**NATURE OF SUIT**  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 810 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 365 Personal Injury – Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ Medicare Act | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | | ☐ 865 RSI (405(g)) | ☒ 895 Freedom of Information Act |
| ☐ Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc Security Act | ☐ 871 IRS – Third Party 26 USC 7809 | ☒ 890 Other Statutory Actions |
| ☐ All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**CAUSE OF ACTION**  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

I am suing under the Freedom of Information & Privacy Act & retaliation against military whistleblower (10 USC 1034)

**REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES  ☐ NO

**RELATED CASE(S) IF ANY**  (See instructions)  JUDGE  Young  DOCKET NUMBER 99-11712

DATE

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _____

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE
    CIVIL COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

    ___ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ___ II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

    ___ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    ___ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    ___ V.    150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES.  (SEE LOCAL RULE 40.1(E)). _____

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
    COURT?                                                          YES ☐      NO ☑

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
    PUBLIC INTEREST?   (SEE 28 USC 2403)                            YES ☐      NO ☑
    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                                    YES ☐      NO ☐

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO
    TITLE 28 USC 2284?                                              YES ☐      NO ☑

7.  DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS
    (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).                  YES ☐      NO ☑
    OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? -
    (SEE LOCAL RULE 40.1(D)).                                       YES ☐      NO ☐

8.  DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF
    THE DISTRICT?                                                   YES ☐      NO ☑
    (a)    IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE? _____

9.  IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?  East

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL
    AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE
    CENTRAL SECTION;  YES ☐ NO ☑        OR WESTERN SECTION;  YES ☐      NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Richard W. Comerford    Pro Se
ADDRESS  9 Spooner II Lane  Plymouth  Ma  02360
TELEPHONE NO.  508 - 833 - 9396

(Categfrm.rev - 3/97)

l

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

**Richard W. Comerford**
Plaintiff,

Vs.

**Civil Action No.**

**Michael W. Steward et al**
Defendant,

**05 - 1 0 4 3 9 WGY**

*Referred to nJ JL Alexander*

## COMPLAINT

## I.    INTRODUCTION

I have made numerous requests pursuant to the freedom of information and privacy acts

to the Secretary of the Army ("Secretary") for a complete and un-redacted copy of my

purported criminal file and to amend said file which he has ignored. Pursuant to a 1999

arbitration agreement in civil action numbered 99-11712-WGY and also a purported

2001 settlement agreement in civil action numbered 00-11671, signed by AUSA Barbara

Healy Smith and my purported attorney Eric S. Maxwell, this matter was referred to the

Army Board for the Correction of military Records ("ABCMR"). The ABCMR accepted

an application from me in 1999 but refused to address this matter in its 2001

recommendation to the Secretary. In 2002 Attorney Eric S. Maxwell, who had not made

an appearance in the above cited action and who I had not retained to represent me in

action number 00-11671, filed an application as part of the above cited settlement

agreement, with the ABCMR for reconsideration of its 2001 recommendation to the

Secretary. The ABCMR did not accept Mr. Maxwell's application. The statutory time

limit of 10-months for the ABCMR to respond to my application had elapsed without any response from the ABCMR. I then filed an application with the ABCMR pro se. The ABCMR also ignored my application. However from about April 2002 to January 2005 the ABCMR lied to the Court and to my Members of Congress about this matter. It fraudulently claimed that it was considering my application. Finally after I filed numerous freedoms of information and privacy acts the government finally admitted to my Member of Congress that the ABCMR was not considering my application and that it did not have a case open on me.

## II. JURISDICTION

This court possesses subject matter jurisdiction to entertain this action pursuant to the Freedom of Information and Privacy Acts (5 USC 552/5 USC 552a) of the United States Code and the military whistleblower act (10 USC 1034).

## III. PARTIES

1. Plaintiff is a United States citizen who resides at 9 Speedwell Lane, Plymouth, Massachusetts.

2. Michael W. Steward was, at the time he investigated me for the purported theft of over $105,000.00 in so-called incapacitation pay and for purportedly making false claims and false statements, the Special Agent in Charge 3rd Military Police Group

2

(CID) located at 27 Quebec Street, Devens, Massachusetts 01432-4424. He is sued in his personal and official capacities.

3. Francis J. Harvey is the current Secretary of the Army with his office located at the Pentagon in Washington D.C. 20310. He is sued in his official capacity.

## IV. <u>VENUE</u>

Venue is properly in this court by virtue of plaintiff's residence in the District of Massachusetts.

## V. <u>FACTS</u>

### <u>Military Service Background</u>

1. I entered the armed forces of the United States in 1971.
2. I served thereafter on active, inactive and Active Guard and Reserve ("AGR") duty as an infantry and Special Forces soldier in the Army, Army Reserve and Army National Guard.
3. In 1992 I qualified for an active duty retirement pursuant to 10 USC 3911.
4. In 1993 I was serving on AGR duty and stationed at Camp Edwards, Massachusetts.

5. AGR duty is performed in the National Guard pursuant to AR 135-18 and 32 USC 502 (f).

6. Pursuant to AR 135-18 and 32 USC 502 (f) AGR duty is described as follows.

7. AGR duty is performed in support of the National Guard and Reserve.

8. AGR soldiers provide organizational, administrative, recruiting, instruction and training support to the National Guard and Reserve.

9. Officers on AGR duty initially serve for a 3-year period.

10. Officers on AGR duty serve for indefinite periods thereafter.

11. Soldiers serve on AGR duty until they have attained 20 years and one month of qualifying service for retirement purpose under 10 USC 3911 unless they have been approved for voluntary retention.

12. Soldiers on AGR duty are discharged from AGR duty by the physical delivery of their discharge certificate (DD Form 214) at the separation point on the effective date of discharge from AGR duty.

13. In 1993 I was assigned as Commandant of a RECONDO (Reconnaissance – Commando) School on AGR duty.

14. In August 1993 I was injured in the line of duty ("ILD") conducting the cliff evacuation of a seriously ill soldier at Poet's Seat in Greenfield, Massachusetts while on AGR duty.

15. After I was injured the Army and Guard denied that I had been injured ILD while on AGR duty.

16. The Army Inspector General ("IG") found that the Army and Guard improperly stopped my entitled active duty medical care and pay without due process I had been injured ILD while on AGR duty.

17. I was not discharged from AGR duty after I was injured ILD in August 1993 while serving on AGR duty.

18. I have never discharged from AGR duty.

19. The Army and Guard stopped my entitled active duty medical care and pay after I was injured in the line of duty ("ILD") because they had been lying to Congress.

20. Essentially the Army and Guard had been cooking the books. They had placed more soldiers, including myself, on AGR duty then were authorized by Congress

21. The Army and Guard then unlawfully had paid I and other soldiers with funds that had not been appropriated by Congress for AGR duty.

22. The Army and Guard have never reported my AGR service to Congress.

23. The Army and Guard have never credited me for my AGR Service on my service record.

24. The Army and Guard have never discharged me from AGR duty.

25. The Army and Guard have never provided proper medical care for my ILD injury.

26. The Army Inspector General ("IG") found that the Army and Guard have never medically returned me to duty after the 1993 ILD injury.

27. The Army and Guard started my pay again and then improperly stopped my active duty as of April 1996.

28. The Army and Guard and have refused to either pay me or discharge me from AGR duty retire me from active duty since April 1996.

6

29. The Army and Guard have also refused to grant me permission to work as a civilian without a discharge certificate (DD Form 214) from AGR duty.

*30.* Instead the Army and Guard fraudulently accused me of purportedly collecting civilian employment pay without a discharge certificate from AGR duty. *See below.*

31. Pursuant to AR 135-18 and 32 USC 502 (f) soldiers on AGR duty are authorized active duty pay until such time as they are duly discharged from AGR duty as described above.

32. The Army and Guard have never paid me active duty pay appropriated by Congress for my AGR duty.

33. Pursuant to AR 135-18 and 32 USC 502 (f) soldiers on AGR duty are authorized active duty, medical care until such time as they are duly discharged from AGR duty as described above.

34. Pursuant to AR 40-3, 40-501 and 135-381 soldiers who are injured ILD on AGR duty essentially fall under the control and are subject to of the active duty medical regulations.

35. Pursuant to AR 40-3, 40-501 and 135-381 soldiers who are injured ILD on AGR duty are referred to a medical treatment facility for care.

36. Pursuant to AR 40-3, 40-501 and 135-381 soldiers who are injured ILD on AGR duty are also referred to a medical evaluation board which evaluates their case and supervises treatment.

37. Pursuant to AR 40-3, 40-501 and 135-381 the case of a soldier who is injured ILD on AGR duty is disposed of by the MTF Commander.

38. The U.S. Army Inspector General ("IG"), and the Massachusetts National Guard medical duty review board ("MDRB"), State Surgeon and Staff Judge Advocate ("SJA") all found that I was injured ILD in 1993.

39. In 1996 the IG also found as mentioned above that I had not received proper medical care for my 1993 ILD injury and that I had not been medically returned to duty after the 1993 ILD injury.

40. In 1997 the MDRB found that I was "not medically fit for continued service".

41. The MDRB referred plaintiff's case to Army medical and physical evaluation boards ("MEB/PEB") for a medical retirement.

42. I have never been medically returned to duty after his 1993 ILD injury or after the 1997 MDRB referral.

43. In January 1995 and again in November 1998 MG Vezina and the Massachusetts National Guard falsely accused me of purportedly working for a non-existent private security company ("Phoenix") and of purportedly collecting civilian employment pay.

44. In March 1995 an investigation by the Massachusetts National Guard SJA could find no evidence that I had collected pay from Phoenix or any other private company.

45. In December the Army asked the U.S. Attorney for Massachusetts to prosecute me for purportedly collecting civilian employment pay.

46. The U.S. Attorney for Massachusetts declined to prosecute me for my purported crime citing lack of evidence.

47. Neither the Army nor the Guard could provide the U.S. Attorney with a single accounting, business or tax document showing that I had purportedly collected employment pay from Phoenix or any other civilian company.

48. In November 2001 the ABCMR finally published a recommendation to the Secretary of the Army ("Secretary) on my case.

49. The ABCMR recommended that I be credited for my AGR service Massachusetts National Guard.

50. It did not recommended that I be discharged from AGR duty.

51. The Secretary approved the ABCMR's recommendation.

52. However I was not credited for my AGR service on my service record.

53. I was not discharged from AGR duty.

54. My AGR service was not reported to Congress.

55. I was not paid active duty pay authorized by Congress for my AGR service.


## Civil Action History


56. In November 1994 and again in October 1998 I filed complaints with the IG and also in 1998 with my Member of Congress ("MC") against the Massachusetts National Guard and its Adjutant General – Major General ("MG") Raymond A. Vezina.

57. In January 1995 and again in November 1998 MG Vezina and the Massachusetts
National Guard unlawfully retaliated against me for communicating with the IG
and My MC.

58. In January 1995 and again in November 1998 MG Vezina and the Massachusetts
National Guard falsely accused me of purportedly working for or being a partner
in a non-existent private security company ("Phoenix") and of purportedly
collecting civilian employment pay from Phoenix.

59. Eventually the Guard and the Army would accuse me of purportedly collecting
employment pay from approximately 13-civilian companies.

60. In March 1995 a log of an investigation conducted by the Massachusetts National
Guard, of which I received a copy of in response to a FOIA request, found no
evidence that I had collected pay from Phoenix or any other private company.

61. In December the Army asked the U.S. Attorney for Massachusetts to prosecute
me for purportedly collecting civilian employment pay.

62. The U.S. Attorney for Massachusetts declined to prosecute me for my purported
crime citing lack of evidence.

63. Neither the Army nor the Guard could provide the U.S. Attorney with a single
accounting, business or tax document showing that I had purportedly collected
employment pay or received stock from Phoenix or any other civilian company.

64. In January 1999 I filed an action in Massachusetts State Court numbered 99-
0416F and sued MG Vezina and the Massachusetts National Guard. I named as
one of the defendants COL Robert E. D'Alto the assistant Adjutant General of the
Massachusetts National Guard.

65. The State government as an affirmative defense fraudulently claimed that I had "dirty hands" because I had purportedly collected civilian employment pay while at the same time collecting pay from the federal government.

66. The State government also claimed that the only "venue" to resolve this matter was by my application to the ABCMR.

67. However the ABCMR, a federal body, did not and does not have authority over the Massachusetts National Guard.

68. The State Judge reviewed the case and told the parties in his chambers after reading the IG Report of Inquiry on this matter that I "had been screwed".

69. The federal government then fraudulently removed the case to federal Court.

70. The federal government purported I had named COL D'Alto as a defendant in his official capacity as a member of the federal armed forces.

71. However COL D'Alto was a member of Massachusetts National Guard and I sued him in his capacity as assistant Adjutant General.

72. The federal government had lied to the State and federal Courts.

73. In federal arbitration the State and federal governments stated that they had declined to prosecute me for my above mentioned purported crime.

74. In federal arbitration the State and federal governments again also fraudulently claimed that the ABCMR was the only venue that could resolve my case.

75. In 1999 an application was duly filed on my behalf with the ABCMR by my then attorney Eric Maxwell.

76. The ABCMR did not open a case upon receipt of my application.

77. Mr. Maxwell decided not to prosecute the case walked away from it an ceased communicating with me.

78. In 2000 I filed another case pro se numbered 00-11671-WGY. The case was in part on this matter.

79. In November 2001 the ABCMR finally published a recommendation to the Secretary of the Army ("Secretary") on my case.

80. The ABCMR recommended that I be credited for my AGR service Massachusetts National Guard.

81. It did not recommended that I be discharged from AGR duty.

82. The Secretary approved the ABCMR's recommendation.

83. However I was not credited for my AGR service on my service record.

84. I was not discharged from AGR duty.

85. My AGR service was not reported to Congress.

86. I was not paid the active duty pay authorized by Congress for my AGR service.

87. I moved Judge William Young to reopen the case.

88. Prior to I moving Judge Young to reopen the case the government had successfully moved Judge Young to consolidate the two cases I had filed pro se with the case it had fraudulently removed from State to federal Court and from which Attorney Maxwell had walked away from in 1999.

89. The government then claimed that Attorney Maxwell represented me in the consolidated action.

90. I then moved Judge Young in court to be allowed to represent myself in the consolidated action.

91. Over the objections of AUSA Smith and as evidenced by the transcript Judge Young ruled that I could represent myself in the consolidated action.

92. Mr. Maxwell then made, as evidenced by the transcript, an appearance as a "friend of the court" in the consolidated action.

93. He did not make an appearance as my attorney.

94. He did not make, and never has made, an appearance as my attorney in the consolidated action.

95. I did not, and have not retained, Mr. Maxwell to represent me in the consolidated action or any other matter.

## My Purported Criminal History

96. The Army and Guard also fraudulently accused me of purportedly collecting so - called incapacitation pay from 1994 to 1996

97. The Army and Guard claimed I was not "authorized" to collect so -called incapacitation pay.

98. Pursuant to AR 135-18 and 32 USC 502 (f) the so called incapacitation pay is not authorized for soldiers on AGR duty.

99. Pursuant to AR 135-18 and 32 USC 502 (f) soldiers on AGR duty are authorized active duty pay until such time as they are duly discharged from AGR duty as described above.

100.    In November 1994 and again in October 1998 I filed complaints with the

IG and in 1998 with my Member of Congress ("MC") against the Massachusetts

National Guard and its Adjutant General – MG Raymond A. Vezina.

101.    In January 1995 and again in November 1998 MG Vezina and the

Massachusetts National Guard unlawfully retaliated against me for

communicating with the IG and My MC.

102.    They falsely accused me of purportedly working for a non-existent private

security company ("Phoenix") and of purportedly collecting civilian employment

pay.

103.    As mentioned above in January 1995 and again in November 1998 MG

Vezina and the Massachusetts National Guard falsely accused me of purportedly

working for a non-existent private security company ("Phoenix") and of

purportedly collecting civilian employment pay.

104.    As mentioned above in March 1995 an investigation by the Massachusetts

National Guard could find no evidence that I had collected pay from Phoenix or

any other private company.

105.    In December the Army asked the U.S. Attorney for Massachusetts to

prosecute me for purportedly collecting civilian employment pay.

106.    The U.S. Attorney for Massachusetts declined to prosecute me for my

purported crime citing lack of evidence.

107.    Neither the Army nor the Guard could provide the U.S. Attorney with a

single accounting, business or tax document showing that I had purportedly

collected employment pay from Phoenix or any other civilian company.

## Steward's Purported Investigation

### Suppression of Evidence

108.    Steward maliciously failed to mention in his report that I had filed a
compliant against the Guard with the IG in December 1994.

109.    Steward maliciously failed to mention in his report that the IG, as
mentioned above, substantiated all of my accusations and found that I had been
injured ILD in August 1993 while on active duty in the Guard and that my Guard
superiors had in violation failed to provide me with enticed active duty medical
lucre and away after I had been injured ILD.

### The Guard Report

110.    Steward maliciously failed to mention in his report that the Guard had
investigated me for purportedly collecting civilian employment pay from Smith
and others and lying about it starting in late 1994 or early 1995 immediately after
I had filed the report.

111.    Steward maliciously failed to mention in his report that the Guard had
investigated me for said purported crimes in early 1995.

112.    The Guard had drafted a report and kept a log (DA Form 1594) of its
investigation dated 22 and 23 March 1995 respectively.

113.    I received a copy of the Guard's March 1995 report (Guard Report) from
the Guard in response to a FOIA Request.

114.    The Guard Report found that I had had been conducting rappelling
        training for the 2nd Battalion of the 104th Infantry Regiment in August 1993 in
        Greenfield, Massachusetts.

115.    The Guard Report found that during said training I had had brought an ill
        soldier down a cliff and had symptoms of a heart attack

116.    The Guard Report found: "Over next 11 mos medical orders to Hospitalize
        him. He was never sent".

117.    The Guard Report found that I served ass Commandant of the Recondo
        School where in addition to military personnel I also trained police.

118.    The Guard Report found that in July 1994 I was declared unfit for duty by
        a Guard physician.

119.    The Guard Report found that after I was declared unfit for duty that I was
        approached by Police SWAT Teams and asked to train them in the capacity of a
        private citizen.

120.    The Guard Report found I continued to train SWAT Teams after I left the
        Recondo School in July 1994.

121.    The Guard Report found that I did not receive either pay from the Guard
        or form the SWAT Teams to train them after July 1994.

122.    The Guard Report found that sometime in early 1995 that I had been
        invited to the New Bedford Police Department ("NBPD") range by the NBPD
        range master SGT Ken Gifford to meet two purported former members of the
        British Special Air Service ("SAS") Regiment from a private company called
        Phoenix USA which was teaching the NBPD SWAT and Snipers.

123.     The two purported former SAS members were identified as David M.
Smith and Bruce Turner.

124.     A full time Guard officer, Lt. Thomas Leonard ordered a NDPD Norman
Duchesneau officer who was also a Guard member to report on my visit to the
NBPD range.

125.     NBPD SGT Gifford stated that the NBPD did not pay me and that that I
was not on the NBPD range on an official basis.

126.     Steward a trained investigator knew or should have known that he should
have mentioned, cited and included the Guard Report in his CID Report.

127.     Steward a trained investigator knew or should have known that the 1996
Guard Report cast doubt on the veracity of the Guard's accusation's against me.

The U.S. Army Inspector General ("IG") Report

128.     As mentioned above I made a written complaint to, and requested
assistance from, the IG in December 1996.

129.     The IG in a report dated 7 February 1996 substantiated each of my
allegations against the Guard and made the following findings:

130.     - That I had been injured in the ILD in August 1993 while on active duty
in the Guard.

131.     – That my Guard superiors had, in violation of Army and Guard
regulations, improperly withheld entitled active medical care and pay from me
after I had been injured ILD.

132.     – That my Guard superiors had, in violation of Army and Guard regulations, improperly amended my active duty orders and stopped my active duty service without due process.

133.     – That my Guard superiors had, in violation of Army and Guard regulations, had improperly conducted the line of duty investigation into my ILD injury and had falsely reported that I had been medically returned to duty after the 1993 ILD injury and that I had received proper medical care after the 1993 ILD injury and had failed to report that I had been injured ILD while on active duty in the Guard.

134.     - That I was initially "improperly denied incapacitation pay" and subsequently "was approved for and received incapacitation Pay".

135.     Attorney Eric S. Maxwell in his law offices on or about 10 December 1998, in the presence of my wife and I, handed a copy of the IG Report to Steward.

136.     Steward maliciously failed to mention, cite or include in his February 1998 CID report the IG report.

137.     The IG Report contradicts Steward's findings that I was not authorized to receive so-called incapacitation pay.

138.     The IG Report also contradicts Steward's reporting of his interviews with my former Guard superiors who claimed that I nether required medical care nor was authorized to receive it.

139.     The IG Report also contradicts Steward's claim that I was a purported part, time member of the Guard when I was injured ILD in August 1993.

140.    The IG report also criticizes my former Guard superiors for withholding
        medical care and pay from me after I was injured ILD in 1993 a for conducting an
        improper line of duty investigation and for filing an erroneous report of said
        investigation.

141.    These same Guard officers initiated the baseless criminal investigations
        against me in 1994/1955 and 1998 within 2-weeks of I initiating complaints
        against the IG against them.

142.    These same Guard officers were interviewed by Steward for his February
        1999 CID Report. In said interviews they launched baseless, defamatory attacks
        against me.

143.    Steward maliciously failed to mention, cite or include in his February
        1998 CID report and unlawfully suppressed evidence that would have exonerated
        me and cast doubt on the good faith of the Guard officers who initiated a baseless
        investigation of me in retaliation for blowing the whistle on fraud, waste and
        abuse within the Guard and the Army.


Affidavit of Rhonda Smith ("Rhonda")


144.    Attorney Eric S. Maxwell, in his law offices on or about 10 December
        1998, in the presence of my wife and I, handed a copy of Rhonda Smith's
        affidavit to Steward.

145.    In her sworn affidavit dated 4 January 1998 Rhonda identified herself as
        the wife of David M. Smith.

146.    Steward in his February 1999 CID Report included documents that
identified Rhonda as the president of a private security company named Phoenix
USA Inc.

147.    In his February 1999 CID Report Steward purportedly established
probable cause that I purportedly "failed to report payments" I had purportedly
received from Phoenix.

148.    However in her sworn affidavit Rhonda stated: "Mr. Comerford was never
an employee of mine or my husband's. Any relationship with Mr. Comerford was
terminated by my husband in early 1995."

149.    Rhonda's sworn January 1998 affidavit contradicts the sworn November
1998 affidavit of her husband concerning my purported employment by Phoenix.

150.    Steward maliciously failed to mention, cite or include Rhonda's Affidavit
in his February 1998 CID report and unlawfully suppressed evidence that would
have exonerated me and cast doubt on the good faith on the Guard officers who
had initiated a baseless investigation of me in retaliation for blowing the whistle
on fraud, waste and abuse within the Guard and the Army.

151.    Steward also purports that I was a partner in Phoenix and that I
purportedly received stock in the company. However as usual Steward failed to
produce any evidence, even perjured testimony, that I  purportedly received stock
in the company

Tampering with and intimidating Witnesses

152.    Steward unlawfully tried to intimidate Massachusetts State Police
        Lieutenant Walter Keenan into falsely swearing that I had collected pay from the
        State Police for training State Police Troopers.

153.    Steward unlawfully tried to intimidate Cambridge Police Department
        ("CPD") Sergeant into falsely swearing that I had collected pay from the CPD for
        training CPD Officers.

154.    Steward unlawfully tried to intimidate Cambridge Police Department
        ("CPD") Sergeant Robert Ames into falsely swearing that I had collected pay
        from the CPD for training CPD Officers.

155.    Steward unlawfully tried to intimidate other witnesses into falsely
        swearing that I had collected civilian employment pay.

156.    Steward unlawfully encouraged David M. Smith to falsely swear that he
        had paid me civilian employment pay.


                        Deliberate Professional Misconduct


157.    As mentioned above in his February 1999 CID Report Steward
        purportedly established probable cause that I purportedly "failed to report
        payments" I had purportedly received from Phoenix.

158.    The only evidence that Steward presented to substantiate this purported
        fact was the above cited perjured November 1998 affidavit of David M. Smith
        ("Smith").

159. Any other reasonable, competent and honest investigator could have easily collaborated, verified and substantiated Mr. Smith's perjured claim that he paid me civilian employment pay.

160. Smith swore that he had a company– Phoenix, which purportedly trained police departments to include the FBI, New Bedford, West Springfield, Boston, Cambridge and State Police. Smith in his perjured affidavit also swore that I became a partner in Phoenix in November 1994 and that he fired me in April 1995. He further swore that during that approximately 6-month period I trained 6-Police department to include the FBI at Quantico, Virginia.

161. Steward did not include or cite in his report any document to show that Smith's company existed or that it had employees or partners or clients or assets. Steward did not include or cite in his report any employment, business, bookkeeping, tax, FICA, Social Security, withholding, banking, check, or payment voucher, document or transaction showing, indicating or inferring that I had collected civilian employment pay from Smith or any other person of company.

162. Any other reasonable, competent and honest investigator could have easily collaborated; verified and substantiated Mr. Smith's perjured claims. Steward did not because he a acted maliciously in an attempt to frame me for a crime he knew I did not commit.

Deliberate Professional Misconduct – II

163.    Steward purportedly established probable cause that I "received $105,000.00 in incapacitation pay which he was not authorized to receive".

164.    Steward as mentioned above maliciously failed to include or cite the IG Report which found that I was entitled to incapacitation pay.

165.    Incapacitation pay is authorized pursuant to AR 135-18.

166.    Pursuant to the above cited regulation said pay cannot be released to the solider until: a) he has been determined as incapacitated by his commander, b) a board of officers have recommended on a quarterly basis said pay; c) the National Guard Bureau ("NGB") approves said pay.

167.    The record shows that: 1) I was authorized said pay by the Guard for the period from July 1994 to April 1996; b) I was certified as incapacitated by my commander, a board reviewed my case and recommended said pay on a quarterly basis; c) NGB approved said pay every 6-months.

168.    The record contains approximately 100 documents that show that I was certified as incapacitated, recommended, approved and authorized said pay.

169.    Any other reasonable, competent and honest investigator would have included or cited the documents on the record.

170.    Steward maliciously failed to include or cite said documents in his report.

171.    Finally I wrote to Steward's subordinate, Agents Timothy Reasoner, in a facsimile dated 7 May 1998 – approximately 9-months before Steward purportedly established probable cause, and outlined my case against the Guard and accused it of fraud, waste and abuse. Any other reasonable, competent and

honest investigator would have included or cited my facsimile in his report

Steward maliciously failed to include or cite it.


Deliberate Professional Misconduct – Misuse of Informants


172.    Steward procured the services of a professional, paid police informant,

David M. Smith (a.k.a. James Smith) in an attempt to frame me for a crime that

Steward knew or should have known that I did not commit.

173.    As mentioned above Smith's perjured affidavit was the only purported

evidence to support Steward's purported establishment of probable cause that I

collected civilian employment pay.

174.    Smith was a former British subject who had served in the British Army as

a physical training instructor.

175.    Smith had served as an informant for the British, American and Irish

governments in Ireland and Northern Ireland and the U.S. to include posing as the

French Foreign Legion veteran "James Smith" and the purported would be

assassin of British Prime Minister Tony Blair in the Real IRA-McKevitt terrorist

case.

176.    He was resettled in the U.S. by the British government.

177.    Smith purported that he had served in the British SAS as a weapons expert

and as an undercover anti-terrorist commando in 14 Intelligence Company

Northern Ireland.

178.     Smith also boasted of having served in the French Foreign Legion as a
weapons expert.

179.     Smith also boasted as having purportedly shot a British Police officer.

180.     Smith also boasted as having purportedly shot an IRA gun man.

181.     To the best of my knowledge Smith never shot anyone. He served a
physical fitness instructor in the British Army. He is a paid, professional liar,
informant, perjurer and Special Forces wannabe.

182.     He worked initially as a personal fitness trainer in which role he met his
wife Rhonda.

183.     He subsequently worked for Rhonda's father as a janitor.

184.     He also subsequently worked for a private security company named North
American Security Company owned by Michael Taylor – a self admitted criminal
wiretapper.

185.     Taylor's business associate was former FBI Special Agent and now
convicted felon John Connolly – an associate of fugitive crime boss James
"Whitey" Bulger.

186.     Taylor was a former member of the 10th Special Forces Group with which
he was stationed for about 3-years at Fort Devens, Massachusetts.

187.     Steward was Special Agent in charge of the Fort Devens' CID office.

188.     While Taylor was stationed at Fort Devens he was indicted for rape.

189.     The Ayer P.D. investigated Taylor for the alleged rape.

190.    The Ayer P.D. investigators complained of interference from and attempts

of intimidation by from the Fort Devens CID office during their investigation of

Taylor.

191.    The case against Taylor was dropped when the alleged victim failed to

appear.

192.    After he was discharged from active duty Taylor was again investigated

for alleged rape. Again the case was dropped when the alleged victims failed to

appear.

193.    After he was discharged from active duty Taylor married into a Lebanese

family with alleged ties to drug trafficking from the Beka Valley.

194.    After he was discharged from active duty Taylor was escorted into

restricted areas of Logan Airport by law enforcement personnel.

195.    Smith was also escorted into restricted areas of Logan Airport by law

enforcement personnel to include Massachusetts State Police Sergeant James

Deyermond.

196.    SGT Deyermond assisted the Guard in its 1995 and 1998 baseless

investigations and retaliation against me as well as assisting Steward in his 1999

investigation.

197.    SGT Deyermond introduced Smith into the 1995, 1998 and 1999 baseless

investigations

198.    Allegedly during this period members of the Bulger Crime Group were

trying to gain access to Logan Airport.

199. Both Taylor and Smith applied for contracts to train the State Police SWAT Team at Logan Airport.

200. Both Taylor and Smith were supported in their efforts by law enforcement personnel with recommendations. Smith received enthusiastic support from SGT Deyermond and other State Police supervisors.

201. Smith in his efforts to secure a contract at Logan fabricated a company named Phoenix Security USA Inc.

202. Smith mailed through the U.S. Mail a fraudulent company profile for the purported Phoenix Security USA Inc. in which he purported to have as partners or employees S. Hammerstrand, N.G. Ely, B. Turner, M. L. Chaney, D. Lema and G.T. Axtell.

203. Both Ely and Hammerstrand advised the State Police that Smith was using their names without their permission

204. The State police ignored Ely's and Hammerstrand's advice and continued to support Smith's efforts to gain access to Logan.

205. Smith also purported to have me as an employee or as a partner in one or more of his companies.

206. Smith in his efforts to secure a contract at Logan also claimed to be a partner and represent a British Security Company called Phoenix Security Management Ltd. Said company was actually run by Mr. Ely who so advised the State Police.

207. Smith in his efforts to secure a contract at Logan further claimed to own another non-existent security company named Phoenix USA Inc.

208.    In all Smith claimed to own or be partners in or be in a business
association with 10 - security companies in the U.S., Europe and Africa.

209.    I had been tasked by the Guard when I was Commandant of the Recondo
School to train the SWAT Team at Logan Airport.

210.    I continued to train the Logan SWAT Team as an unpaid volunteer after I
was injured ILD.

211.    The Director of MASSPORT, which supervised Logan, was Peter Blute.
He blocked the attempts of Taylor, Connolly, Smith and the Bulger Crime Group
to gain access to Logan – despite the best efforts of the State Police.

212.    In retaliation Taylor et al, hired a young lady to remove her top on board
the annual booze cruise in Boston harbor for the MASSPORT staff, while
standing behind Mr. Blute. A photographer retained by Taylor et al was standing
by to capture the moment and the resulting photo appeared the next day on the
front page of the *Boston Herald.* Mr. Blute subsequently resigned and the State
Police renewed its efforts to gain access to Logan for Taylor, Smith et al.

213.    State Police supervisors then directed that I not be allowed to train State
Troopers.

214.    State Police supervisors enthusiastically supported the baseless
investigations of Army and Guard into my purported collection of civilian
employment pay.

215.    Steward a trained investigator knew or should have known that the State
Police were trying to frame me.

216.    As mentioned above law enforcement personnel to include members of the State Police escorted Smith and Taylor into restricted areas of Logan. Also, as mentioned above, Taylor had married into an Arab family with alleged ties to drug trafficking from the Beka valley in Lebanon.

217.    Allegedly drug trafficking from the Beka valley in Lebanon was one of two principal funding sources for AL Qaeda.

218.    The other alleged source was diamonds from Sierra Leone and Liberia.

219.    Smith claimed to work as a security consultant in Sierra Leone and Liberia prior to 9/11/01.

220.    Smith disappeared after 9/11/01.

221.    The Director of Security of MASSPORT, a State Police classmate of SGT Deyermond's, stepped down after 9/11/01.

222.    After 9/11/01 State Police supervisors stopped making employment and contract recommendations for Taylor and Smith and became tight lipped about their association with Taylor and Smith.

223.    The State Police have refused to respond to numerous FOIA request from me for a copy of their file on me.


Unlawful Retaliation Against a Military Whistleblower


224.    I filed written complaints with the IG against the Guard in December 1994 and with the IG and my MC in October 1998.

225.     In January 1995 the Guard attempted to frame me for theft. The March
         1995 Guard Report could find no evidence that I had collected civilian
         employment pay.

226.     In October 1998 the Guard again attempted to frame me for theft.

227.     Steward failed to include, mention or cite my 1994 and 1998 IG
         complaints against the Guard or connect the complaints with the immediate and
         subsequest purported accusations of theft. In December 1998 the U.S. Attorney
         for Massachusetts refused to prosecute me for purported theft citing lack of
         evidence and also advised Steward that I had filed a whistleblower complaint
         against the Guard.

228.     Steward knew or should have known that I had never been discharged
         from AGR duty and that I was entitled to active duty pay until such time as I was
         discharged from AGR duty. The whole issue of incapacitation pay was trust an
         attempt at entrapment on the part of the Guard.

229.     Any other reasonable, competent and honest investigator would have
         mentioned the complaints and the subsequest accusations of purported criminal
         misconduct and the fact that I had not been discharged and was entitled to pay..

## VI. CLAIMS

I hereby claim that the defendant has lied in writing to his superiors about the false
accusations made against me by the Guard. Steward fabricated evidence in an attempt to
frame me for a crime he knew or should have known that I did not commit. He filed a

## Military Abbreviation Index

The U.S Army makes extensive use of abbreviations and acronyms in its regulations, documents and to include the official military record in this case. Following, for the Court's convenience, are the most common ones used by the U.S army in documents connected with this case.

1. AD: Active Duty

2. AGR: Active Guard and Reserve

3. AR: Army Regulation

4. CID: Criminal Investigation Division

5. IDT: Inactive Duty Training

6. IG: Inspector General

7. ILD: In Line of Duty

8. LD: Line of Duty

9. MAANG: Massachusetts Army National Guard

10. MEB: Medical evaluation board

11. MG: Major General

12. MDRB: Medical Duty Review Board

13. MTF: Medical Treatment Facility Commander

14. NGB: National Guard Bureau

15. OER: Officer evaluation report

16. PEB: Physical Evaluation Board

17. RECONDO: Reconnaissance Commando

false police report. He attempted to intimidate two police officers who were witnesses in this matter into committing perjury. Steward suppressed evidence that would have exonerated me of the fraudulent accusations. He acted in this dishonorable fashion in order to unlawfully retaliate against me for lawfully communicating the IG and my Members of Congress and reporting fraud, waste and abuse within the Guard and the Army and to gain favor with his own superiors in order to advance in career. In so doing he destroyed my own career as well as my good name.

## VII Prayer for Relief

WHEREFORE, plaintiff respectfully requests that this Honorable Court

(1) Enter a declaratory judgment that Steward knowingly, deliberately and intentionally:

- (a) - Filed a false police report in February 1999 which contained statements that he knew were false or perjured.
- (b) - Suppressed evidence that would have exonerated me.
- (c) – Manufactured avoidance in an attempt to frame me for crimes that he knew that I did not commit.
- (d) - Attempted to intimidate and tamper with witnesses to include encouraging them to perjure themselves.
- (e) – Unlawfully retaliated against me for blowing the whistle on fraud, waste and abuse within the Guard and Army in violation of 10 USC 1034.

(2) Order the Army to properly amend the false February 1999 CID report.

(3) Order the Army to remove me from a list of individuals who it had been "titled", i.e.

– identified as having probable committed a crime.

(4) Order the Army to provide me with a complete, un-redacted copy of its purported

criminal investigation of me to include all reports, documents tapes, videos, notes,

both formal and both informal, written and electronic

(5) Order the defendants to provide me with compensation for the loss of my good name,

profession, military entitlements, promotion and my ability to earn a living.

(6) Enter a judgment against the defendant for plaintiff's costs plus reasonable fees.

(7) Grant such other and further relief, as it deems just and meet.


Plaintiff respectfully requests trial by jury.

Respectfully submitted this 27th day of February 2005 AD,

Richard W. Comerford Pro See
9 Speedwell Lane
Plymouth, Massachusetts 02360
(508) 833-9396